UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 3:18CR-37-VAB |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID VANGAS | ) | AUGUST 12, 2019 |

-----------------------------------------------------

## **MEMORANDUM IN AID OF SENTENCING**

The Defendant respectfully submits this Memorandum as an aid to assist the Court at his sentencing that is scheduled for August 26th. He seeks a non-guideline sentence of "time served," followed by four years of supervised release, which should include vocational training and mental health screening. He also asks the Court to waive any fine, except the mandatory $100 special assessment.

I. **PROCEDURAL BACKGROUND**

On December 7, 2017, David was arrested pursuant to a single-count Information which charged him with Conspiracy to Possess with Intent to Distribute, and to Distribute, 500 Grams or more of Cocaine, in violation of 21 U.S.C. §§ 841 (a)(1), b(1)(B), and 846. After his presentment, he was detained at New Haven Correctional Center for approximately 11 months until the Court allowed him to attend the Salvation Army Adult Rehabilitation Center ("Salvation Army Program") in Hartford, CT, where he spent approximately 7 months during two separate admissions to the Program. In total, David has spent approximately 18 months in pre-sentence custody (11 months at New Haven Correctional Center and 7 months at the Salvation Army Program).

On February 28, 2018, David appeared before the Court (Bolden, J.) and pled guilty to the single-count Information. His plea agreement contains a provision that the quantity attributed to him results in a base offense level of 30. After a 3-point adjustment for acceptance of responsibility and a two-point minor participant adjustment, his total offense level is 25. Moreover, the parties agree that David falls within Criminal History Category II, resulting in an advisory guideline range of 63-78 months of imprisonment. PSR, ¶4. The Court may wish to consider whether a sentence within the applicable guidelines range <u>is more than necessary</u> to serve the purposes of sentencing.

**David Should Receive a 4-Point Reduction as His Involvement in This Case Should Be Properly Categorized as "Minimal" Rather Than as "Minor."**

David's sole action in the underlying case was to be the addressee for various packages of narcotics that were delivered to his apartment in Waterbury. Section 3B1.2 of the Sentencing Guidelines would allow a mitigating adjustment to David's offense level. For a defendant who had a minor role in an offense, a two-point reduction is warranted. However, for a defendant such as David who had a minimal role in the offense conduct, a four-point reduction is warranted. As Section 3B1.2, application Note 4 indicates, the Commission states that the term "minimal participant" is "intended to cover a defendant who was plainly the least culpable of those involved in the conduct of a group." David recognizes that he bears the burden of proving his participation warrants a minimal participant reduction.[1] The 2015 Amendments state that in determining whether a mitigating role is appropriate, the defendant is to be compared with the other participants. Counsel believes that David was the least culpable of any of the participants in this matter. "But for" his receiving the packages, David had no other involvement in the

---

1 See, United States vs. Shonubi, 998 F.2D 84, 90 (2nd Cir., 1993).

distribution of narcotics in this case. As such, his participation was "minimal" and justifies a four-point reduction in his Offense Level.

David has several prior felony convictions: an August, 2003 Sale of Narcotics conviction at age 19, and a January, 2012 conviction for disorderly conduct at age 28. ¶¶ 33, 37. Defense Counsel obtained copies of the sentencing transcripts for these two convictions, attached hereto as Exhibits F and G, respectively. Counsel also obtained the sentencing transcript for David's September, 2011 arrest for possession of narcotics, attached as Exhibit H. A reading of these transcripts, as well as David's other convictions as enumerated in his Presentence Report, reflects the fact that David's past arrests are Connecticut Geographical Area court matters that are lower level crimes for which David has never served imprisonment. It should be noted that none of David's prior arrests involved weapons or any kind. As such, David can be considered a person who does not pose a serious threat to society and underscores the fact that imprisonment simply is not warranted in this case.

The Court is mandated to impose a sentence that is fair and reasonable given the goals of sentencing. For this reason, a guideline sentence is <u>more</u> than sufficient in this case and should not be imposed.

II. **DAVID AND HIS LIFE**

 **A Tragic Upbringing.**

David was born in 1983 in Philadelphia, PA. He is the only child born to the relationship of his parents, who were never married. He lived most of his early years in the Bronx, New York, where he attended public school, completed 10th grade, but withdrew from high school prior to the 11th grade. (See Exhibit A, page entitled "Transcript of High School Record). A review of his school records indicates that he took a variety of courses, such as auto repair,

Spanish, Algebra, Global Studies, and English. Most of his grades were "satisfactory," and it appears that he did not fail any classes. The reason behind his dropping out of school after the 10th grade is not clear. He did earn his high school equivalency degree from the Waterbury Adult Education program, but has not pursued any college education or trade school education.

During his interviews with USPO Mark Meyers and with USPO Meghan Nagy, David spoke openly about his family and his upbringing. He stated that he comes from a fractured family in which he felt that he "always came last." This is a very disturbing admission. While David has five half-siblings, he does not appear to have contact with any of them.

David's mother died when he was only seven years old, and he considers his mother's death -- understandably – as the "worst day in my life." It was not just the tragedy of losing his mother that was traumatic, but also the fact that he was then shuffled between his emotionally distanced father (who lived in Philadelphia) and his older sister (who lived in the Bronx). This period of David's life was very difficult for him, as he describes as follows:

> "When I was about three years old, we moved to the Bronx into my mom's own apartment. At the age of seven years old, I went through the hardest experience of my life. I woke up one morning and went out into the living room to ask my mom for breakfast. She was sitting at her table drinking coffee when she looked at me and asked who I was. […] Three days later she died. I was then raised by my older sister. She had three boys of her own so <u>I was last on the list</u> for everything because her kids came first. <u>I started to act out and do things I wasn't supposed to do,</u> but I always did good in school and got good grades. (underlining added).
>
> . . .
>
> "When I was 15 years old, I was hit by a car. I got a settlement check when I was 17 years old for $16,000. My sister wanted to move from the Bronx to Waterbury, but I did not want to leave my friends. When we moved, my sister's drug-addict boyfriend moved in with us. My sister then started to use drugs, and they ended up stealing more than $9,000 of my lawsuit money. I moved out and into an apartment with my co-defendant José Rivera, who I have known since I was three

years old. At some point, I moved out from living with Jose and lived on my own." (See David's letter, Exhibit C.)

**David Then Takes the "Wrong Fork" in the Road of His Life…**

Unfortunately for David, and as he will readily admit, he has a history of making poor decisions. He acknowledges that living with his friend Jose, a co-defendant in this case, was a poor decision:

> "I then moved back in with José [co-defendant], which <u>was the worst mistake I ever made</u>. Being in that house with him was hard for me because I had to watch him and the others have money and nice cars, while I was living "paycheck to paycheck." <u>This led to my downfall</u>. Having them as friends and going through what I went through during these last couple of years was the worst decision of my life. "(Id.) (quotes and underlining added).

**… But David Acknowledges that His Arrest May Have Saved His Life.**

> "Being in jail for that long [11 months] was the longest time I've ever spent in jail, and doing the Salvation Army Program really made me humble myself. I realized that the people I thought were my friends, really did not have my best interest in mind for me. I have hurt my kids during this present situation. I thought I would lose my fiancée and the rest of the people that really care and love me. I have been through a lot of ups and downs in my life. I can honestly say that this situation **has steered me straight."** (emphasis added). (Id.)

**David Does Have Emotional Support.**

David readily admits remorse for the poor decisions that he has made. But he is fortunate that he has several people in his life who love and support him. He continues in his letter as follows:

> "Since I've been home, I have been doing the best I can to better my life. I have a part-time job as a toolmaker and a second job at the towing company where I do shop work and clean the garages. I even work at other properties that are owned by the owner of the company.
>
> "I get to spend time with my kids, which is great because I missed out on so much of their life. I spend a lot of time with my fiancée whom I love with all my heart. I am not writing this to say I'm a good person, because I am more than that

**5**

to these people that love me. I just put myself in a position where I made a bad choice and a bad decision. <u>If I can take it all back, I would do so in a heartbeat.</u> At my sentencing, I will thank the judge, my attorney, and my probation officer for letting me spend the last few months with my family." (Id.) (underlining added).

Other people agree that David has made major changes in his life. For example, Xiomara Cortez, David's girlfriend, describes how David is trying to better himself – and she realizes that David faces difficult challenges in the process. Ms. Cortez wrote in her letter:

> "David has been trying not to look back to his past. He wants to change his life for the better. He has learned from his mistakes. David is one of the strongest people I know. … As he was growing up, he made choices that he should not have made because his bad choices led him to where he is now. But he also learned from his mistakes. I know no one can go back and start a new beginning, but anyone can start today and make a new ending. David got rid of the toxic people in his life. He is trying to do what is best to stay positive. He is a better person now than he was in the past. Each new day is another opportunity to get things right. I know that he is doing the best that he can do. All he needs is a chance. Freedom is nothing else but a chance to do better. How often we wish for another chance to make a fresh beginning and to undo our mistakes and to have a new outlook. <u>He has a determination like never before</u>." (ellipses and underlining added).

Additionally, Grace Maldonado, David's nephew's (Erick Padilla's) common-law wife, who also lives in the same apartment as David, also offers several insightful comments about David. She states as follows:

> "I have taken on the responsibility of having David in my household along with my family. Since David has been residing with us, he has been doing great. He is staying out of trouble, staying focused, and doing what he needs to do in order to get on his feet and have his own place. Since the Salvation Army Program, David has gotten a part-time job at a toolmaker company, and he has also been working alongside his nephew Erick at the towing company. While David has been living with us, I give him guidance and also a clear-minded understanding of house rules. Even though he is older than me, I insist on rules – not to control him, but rather to keep him out of trouble and prevent him from going back to his old ways. (See Exhibit E).

In addition, Ms. Maldonado observed first-hand David's efforts to be a better father. Ms. Maldonado says in her letter:

> "He has been doing good in his communications with his kids to make up for the lost time due to his incarceration. If he goes back in, it's not because he didn't try. <u>He does not want to go back to his old ways and get into trouble</u>." See Exhibit E. (underlying added).

David has become more involved in the lives of his five children. His efforts to be a better father are evidenced by his voluntary participation in the "Better Fatherhood" Program which he attends in Waterbury. As indicated in the description that is contained in Exhibit B, the program "supports fathers seeking constructive ways to better provide and nurture their children" by learning tools that achieve positive parenting outcomes. David is eager to be a better father to all of his five children, and he is very proud of his children as he indicated in his letter:

> "My first son loves basketball. He was a freshman last year and played on the varsity team -- which is unheard of in high school. My oldest daughter was born when I was 25 years old. She will be going into her freshman year next month, and she wants to become a forensic scientist. My second daughter was born when I was 28 years old, and she wants to become a veterinarian." See Exhibit C.

**David's Post-Arrest Conduct**

After his presentment, David was detained at New Haven Correctional Center for eleven months, which was the longest period of time that David had been detained after an arrest. Counsel was able to arrange a place for him at the Salvation Army Drug Program in Hartford. Unfortunately, as the Court is aware, David was first discharged from the Program after approximately seven months for having a cell phone in his room, which was against the Program's rules. Counsel worked with Ms. Corliss Petty, the Admission Director at Salvation

7

Army, to allow David to return to the Program. However, after another two months, David, while visiting his family in Waterbury on a "pass" from the Program, had car trouble (flat tire) and was unable to return to the facility by curfew time. This incident resulted in his being discharged a second – and final -- from the Program.

Despite the fact that David was discharged from the Salvation Army Program, the undersigned argues that David's total time in the Program was almost 8 months, which is longer than the Program length of 7 months. The insight to be gained here is that despite his being discharged for having his cell phone (with which he called his children) and for missing curfew (due to having a flat tire with his car), David in fact presumably was in compliance with the Program as he was never disciplined for anything of substance. In other words, he was able to comply (setting aside his two discharges) with the rigors of the Program. Such compliance should be noted.

After being discharged from the Salvation Army program for the second time, David was released pre-sentencing. He lives with his nephew Eric and his wife in an apartment in Waterbury. David has two jobs right now. One job is with MTS Tool Manufacturing, Inc., in Waterbury, CT, where he works as a tool machine operator. Counsel recently spoke with David's supervisor, who gave a glowing review of David's positive qualities. These included David's punctuality, his willingness to do whatever is asked of him, his desire to improve his job skills, and his overall pleasant nature. The supervisor said that he hopes David can work more hours. The supervisor's entire description of David was positive in tone. Counsel also spoke with the owner of Waterbury Towing. David's duties were confirmed to include performing light maintenance on vehicles, cleaning up the garage when necessary, and being an all-around helper for whatever needs to be done. The owner of this company, like the owner of MTS Tool

Manufacturing, had nothing but good things to say about David. Perhaps the most insightful comment that the tow company owner said about David was the following:

> "<u>I wish all of the employees were like David</u>. He is a model employee who does whatever needs to be done and does it with promptness and thoroughness." (emphasis added).

These glowing reports from the two employers indicate that David can be a valued employee and is eager to learn. To his credit, and setting aside the two infractions at the Salvation Army Program, David has been *completely* disciplinary-free since his arrest. He works at two jobs, lives with family members, is drug-free, and attends the "Fatherhood Initiative." In sum, David finally leads an upright life, but needs help from the Court in order to continue the progress that he has made thus far in order to achieve a productive life in society. Thus, vocational training can provide a meaningful step towards a stable, skilled career, something he has not had in his life.

**III.     David Would Benefit from Vocational Training and Mental Health Screening.**

Rehabilitation is the critical goal in terms of enabling Mr. Vangas to continue as a productive member of society. The Court should help David continue his productive life. He needs to avail himself of the services, such as vocational counseling and training, that can be received through the assistance of the U.S. Probation Office. While David does not currently have any specialized trade or vocational skills, he would like to "better himself" by learning new job skills. He does not need to be incarcerated in order to receive such training. He has demonstrated his ability to be a good worker, as reflected in the glowing comments from his employers. He thus has the ability to learn and benefit from vocational training. At age 36, he is still young enough to have a stable career in order to provide for himself and, more importantly, his five children.

David could also benefit from mental health screening. Given the trauma that he experienced as a young child, feeling marginalized and "always last" by his relationship with his siblings, and the current feelings of depression that he described to USPO Nagy, there is no doubt that he carries painful and deep scars from his childhood. The probation office should also screen David for any additional mental health needs that may surface while on Supervised Release.

## IV.  CONCLUSION:

Of the four goals of sentencing as outlined in 18 U.S.C. 3553(a), rehabilitation needs to be achieved in this case, and it will not be achieved by any period of incarceration. David poses a very low risk of recidivism. The need for specific deterrence is not of great importance in this case. Neither is general deterrence, since incarcerating David for a substantial amount of time would not likely yield any general deterrence to others. Thus, the Court should enable David to work to improve his career and to improve his parenting skills. Both of these goals can be facilitated by vocational training and mental health counseling arranged through the assistance of the U.S. Probation Office. Imprisonment simply is not warranted.

Respectfully Submitted,

DAVID VANGAS
BY:  /s/Richard C. Marquette/s/
Richard C. Marquette, Esq. (#ct07585)
GOLDBLATT, MARQUETTE & RASHBA, PC
60 Washington Avenue, Suite 302
Hamden, CT 06518
Tel.   (203) 288-6293 / Fax. (203) 288-0283
Email: RCMarquette@aol.com

CERTIFICATION OF SERVICE

      This is to certify that on August 12, 2019, a copy of the foregoing was filed with the Court via the CM/ECF system, by which counsel to all parties, including the Government, will be notified of and have the opportunity to review this filing.

      BY: /s/Richard C. Marquette/s/
          Richard C. Marquette, Esq. (#ct07585)
          GOLDBLATT, MARQUETTE & RASHBA, PC
          60 Washington Avenue, Suite 302
          Hamden, CT 06518
          Tel.    (203) 288-6293
          Fax.   (203) 288-0283
          Email: RCMarquette@aol.com